UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**THOMAS M. MURPHY**                                                                 **PLAINTIFF**

   v.                                                                                    No. 3:21-cv-438-BJB

**ROUNDPOINT MORTGAGE SERVICING**                                       **DEFENDANTS**
**CORPORATION, ET AL.**

\* \* \* \* \*

<u>**ORDER GRANTING SUMMARY JUDGMENT**</u>

  Few things are worse for a homeowner than a house fire—except, perhaps, discovering the insurance policy lapsed and won't cover the damage. Thomas Murphy faced that reality—or so he thought—when his house caught fire and The Hartford denied his claim. He blamed the lapse on his mortgage servicer, RoundPoint, which he says failed to re-up his coverage and left him exposed to this loss—all in violation of its contract, fiduciary obligations, federal regulations, and ordinary obligation to act reasonably.[1]

  After years of discovery, RoundPoint's response channels the late basketball broadcaster Chick Hearn: "no harm [and] no foul." Undisputed evidence, RoundPoint contends, shows that it secured *better* insurance for Murphy after the owner—not the servicer—failed to pay insurance premiums or even respond to letters about the lapse in Hartford coverage. And in the end, that other insurer (National General) paid Murphy's claim—albeit perhaps not as promptly or fully as Murphy desired—leaving the homeowner unable to show any loss he suffered as the result of RoundPoint's action or inaction.

  None of those important points are called into question by the limited evidence (a mortgage instrument to which RoundPoint is not a party and a few lines from a RoundPoint employee deposition) to which Murphy points in response. At this point, Murphy may not rely on his allegations alone, but must instead "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Since no genuine facts issues

---

[1] The Amended Complaint also names Freedom Mortgage Corporation as a Defendant due to its merger with RoundPoint in August 2020. DN 59 at 2. But the parties reached an agreement to dismiss the claims against Freedom without prejudice, DN 83, so it is no longer a party, DN 84.

remain for a jury to decide, no trial is necessary and summary judgment is appropriate. FED. R. CIV. P. 56(a).

## I.   The Undisputed Record

As for Murphy's story, it is straightforward and undisputed. He bought his Louisville home and insured it with The Hartford in January 2019. Tyler McGee Declaration (DN 117-2) ¶¶ 7, 14. Soon after, RoundPoint began servicing the mortgage, but it didn't renew the Hartford policy when it came due the next January. ¶¶ 22, 35–36. Then, on June 7, 2020, a fire caused six-figure damage to Murphy's home and personal property. ¶ 42. He promptly filed a claim, but The Hartford denied it, citing a lapse in coverage. ¶ 43.

That much was clear from Murphy's amended complaint. But during discovery, the rest of the story developed in a way that would've made Paul Harvey proud. It turns out Murphy's home was insured all along—just by a different company.

Murphy obtained his mortgage through an agreement with Fairway Independent Mortgage Corporation. Mortgage (DN 123-1). The mortgage required Murphy to make monthly payments for principal, interest, and escrow items—which included taxes and premiums for insurance required by the lender. ¶¶ 1, 3. It also required Fairway to pay the escrow items according to the provisions of the Real Estate Settlement Procedures Act. ¶ 3. The mortgage permitted Fairway to receive payments and fulfill its other duties[2] by subcontracting with a loan servicer. ¶ 20. Fairway exercised that right by subcontracting with RoundPoint, a mortgage servicer. Shortly thereafter, RoundPoint notified Murphy that Fairway had "partnered with RoundPoint to service" the loan. *See* Notification of Servicing Transfer (DN 117-2, Attachment 4). That notification indicated that as a "servicer," RoundPoint would collect Murphy's mortgage payments and make tax and property-insurance payments on his behalf. *Id.* When RoundPoint began servicing the mortgage, it ran a loan report that showed RoundPoint had no proof of homeowner's insurance on file for Murphy's home. McGee Declaration ¶ 23. At this point, if RoundPoint couldn't verify coverage, it was bound by its contract to obtain substitute insurance to guarantee the value of the house was protected from risks like, say, fire.

RoundPoint tried to contact Murphy multiple times about his insurance coverage—a point Murphy didn't dispute during the summary-judgment hearing (DN 126). RoundPoint sent Murphy two letters requesting proof of insurance, warning that if records didn't materialize then RoundPoint would obtain new coverage. McGee Declaration ¶¶ 24–25, 27–28. Hearing no response, RoundPoint did in fact

---

[2] Described succinctly and generically as "other mortgage loan servicing obligations." Mortgage ¶ 20.

secure a lender-placed policy through National General in June 2019, as the mortgage required. ¶ 30. Then RoundPoint sent Murphy three more letters: one in June 2019 to confirm and explain the purchase, another in March 2020 about the policy's upcoming renewal, and a final notice in May 2020 to confirm the renewal. ¶¶ 32–33, 38–39, 41. Again, during the hearing Murphy didn't dispute that he received all five letters—and McGee's declaration indicates (without rebuttal) that he failed to respond to any of them, ¶¶ 26, 29, 34, 40. The Hartford sent him two letters in 2020 as well—a January premium bill and a February cancellation notice to warn that coverage would end soon if he didn't pay. Sonya Schwoyer Affidavit (DN 117-3) ¶¶ 7–10; McGee Declaration ¶¶ 36–37. Nothing indicates he responded to those, either.

RoundPoint's first letters to Murphy requesting proof of coverage had cautioned that a lender-placed policy might cost more and cover less, but neither happened here. National General's premium ($1,233.96) was *lower* than both The Hartford's initial premium and its renewal rate ($1,406.54 and $1,569.26, respectively). McGee Declaration ¶¶ 20, 41; Schwoyer Affidavit, Exhibit 1.

More importantly, a year after the fire National General told Murphy it would "mirror" Murphy's Hartford policy by paying exactly what that policy would have covered. McGee Declaration ¶ 45. Under that policy, National General has issued payments of $141,353.69 to Murphy. Joint Status Report (DN 28) ¶ 3.

At the summary-judgment hearing, Murphy disputed that the National General policy put him in the same position as the Hartford policy would have: its payments were delayed, and it denied coverage for $10,000 in water damage. Murphy believes the Hartford policy would have paid faster and not denied this coverage had it been in place. But he conceded that he had no proof or knowledge of what Hartford would have done. The parties haven't pointed to anything in the record indicating what The Hartford would have done differently than National General.

## II.   Summary Judgment is Warranted for Two Reasons

And now we know the rest of the story. RoundPoint argues that this undisputed evidence shows Murphy lacks any damages because he's in no worse position than he would've been under the Hartford policy. And even if Murphy could, no record evidence shows a breach of any legal duty.

### A. Murphy's Lack of Damages Evidence Bars All Four Claims

Damages is an element of each of Murphy's three state-law claims: breach of contract, breach of fiduciary duty, and negligence.[3] As for the federal claim,

---

[3] *Jordan v. Hibbeln*, No. 2016-ca-406, 2018 WL 3090442, at *5 (Ky. Ct. App. June 22, 2018) (plaintiff alleging breach of contract must prove he suffered "damages flowing from that breach"); *Seeger Enterprises, Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791,

3

mortgage-servicer liability under RESPA requires either "actual damages to the borrower" or a "pattern or practice of noncompliance" (which may entitle a borrower to statutory damages). *See* 12 U.S.C. § 2605(f); *Miller v. Bank of New York Mellon*, No. 21-1126, 2021 WL 5702331, at *4 (6th Cir. Dec. 1, 2021) (addressing statutory and actual damages separately).

Murphy advances two theories of monetary damages: National General's policy cost more and covered less than The Hartford's. His summary-judgment response repeats allegations that RoundPoint "forced [him] into a costly force-placed insurance policy" and left him with "insufficient coverage to fully repair the damage" from the fire. Response to MSJ (DN 123) at 7 (citing no record materials). But the only evidence in the record indicates that the National General policy cost *less* than the Hartford policy. *See* McGee Declaration ¶¶ 20, 41; Schwoyer Affidavit, Exhibit 1. It also shows that National General agreed to "mirror" the Hartford policy's coverage. *See* McGee Declaration ¶ 45. And because Murphy conceded at the hearing that no evidence reveals what The Hartford would have done, nothing rebuts RoundPoint's position Murphy ended up with identical coverage at a lower price.[4] So Murphy cannot and has not identified how coverage from one insurer rather than the other cost him any money—defeating the damages elements of his claims.

During the summary-judgment hearing, Murphy tried to introduce a related theory of loss: Murphy paid overlapping premiums to National General *and* The Hartford for several months. But neither his pleadings nor his briefing advance that argument. To the contrary, Murphy's interrogatory responses (attached to RoundPoint's summary-judgment brief at DN 117-6) itemized twelve different types of alleged damages—none of which touched on duplicative premium payments. "[C]ourts treat claims as forfeited at summary judgment when they're addressed 'in a perfunctory manner,' without 'some effort at developed argumentation.'" *Boerste v. Ellis Towing, LLC*, 607 F. Supp. 3d 721, 736 (W.D. Ky. 2022) (quoting *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x. 246, 250 (6th Cir. 2009). And RoundPoint "would suffer real prejudice if the Court required [it] to confront a new and unpled …

---

795 (Ky. Ct. App. 2017) (plaintiff alleging breach of fiduciary duty must prove that the breach "caused injury to the party to whom the duty was owed"); *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (a common-law negligence claim requires "injury to the plaintiff").

[4] The National General policy is not in the record, but the available evidence indicates it provided residential coverage only up to $161,618. National General Notice of Insurance (DN 117-2, Attachment 7) at 1. Murphy's Hartford policy, by comparison, covered the dwelling up to $164,000, with additional coverage of $123,000 for personal property and $41,000 for loss of use. The Hartford Policy (DN 117-2, Attachment 3) at 1. National General's subsequent agreement to mirror the original policy renders these difference irrelevant for damages purposes.

theory *after* [it has] already completed discovery and fully briefed and argued a raft of summary-judgment and other motions." *Id.* So Murphy has forfeited any argument that he suffered damages due to the overlapping insurance premiums, and the Court won't consider that new theory at this stage in the proceedings.[5]

Because Murphy lacks evidence to support his damages theories, no genuine issue of material fact remains regarding that element—which is essential to at least his three common-law claims.[6] National General's decision to "mirror" the Hartford policy resolves the issue, leaving Murphy without any basis to argue that he's worse off than if his policy never lapsed. That undisputed fact defeats his contract breach, fiduciary breach, and negligence claims—all of which require damages.

What about his statutory claim? RESPA typically requires actual damages, too, but it contains an exception that Murphy raised in his amended complaint. Anyone who fails to comply with RESPA is liable to the borrower for "(A) any actual damages to the borrower as a result of the failure," which don't exist as discussed above, "and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section." 12 U.S.C. § 2605(f)(1). Given the lack of evidence of loss, even Murphy's RESPA claim persists only to the extent he can prove RoundPoint engaged in a "pattern or practice" of noncompliance with that statute. Murphy alleged such "pattern or practice" in his amended complaint. Amended Complaint ¶ 38. But at summary judgment, he neither advanced that argument nor produced any evidence that would support it.

Because Murphy has failed to support that argument, or even address it at summary judgment, the Court considers that claim abandoned. *See Anglers of the Au Sable v. U.S. Forest Service*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.") (citing *Graham v. American Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir.

---

[5] Even if Murphy paid an unnecessary premium for a short period of time, it's hard to view that as RoundPoint's fault since, as discussed below, RoundPoint tried to communicate with Murphy about the second policy on several occasions—all without response. Nor is it obvious that Murphy necessarily suffered a "loss" by retaining coverage from multiple insurers until he stopped paying premiums.

[6] Murphy's pleadings also advanced a theory of emotional damages. *See* Amended Complaint ¶¶ 18, 39, 42 (alleging "emotional distress" and other emotional damages). But he didn't pursue this theory at summary judgment, and therefore the record doesn't appear to contain any evidence to support such a theory. To say nothing of the expert proof that Kentucky law arguably requires when the only alleged damages are emotional ones. *See Osborne v. Keeney*, 399 S.W.3d 1, 17–18 (Ky. 2012) (requiring expert proof of emotional damages for negligent infliction of emotional distress, which arguably applies if no other damages exist).

2003)). So because the only RESPA claim Murphy attempts to factually support requires actual damages, and because evidence of such damages is missing, this RESPA claim cannot survive summary judgment either.

### B. Murphy Provides No Evidence that RoundPoint Violated a Legal Duty

Even if damages weren't an issue, each claim (contractual, fiduciary, negligence, and statutory alike) requires Murphy to identify a distinct legal duty that RoundPoint breached.

**1. Contract**. Murphy argues that RoundPoint breached contractual obligations it owed Murphy by allowing the Hartford policy to lapse and mismanaging Murphy's escrow account. Response to MSJ at 10. To prove breach of contract under Kentucky law, a plaintiff must show (1) a contract, (2) its breach, and (3) resulting damages. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019). Murphy's contract claim fails because he hasn't offered proof that he had a contract with RoundPoint in the first place.

RoundPoint isn't a named party to the mortgage agreement between Murphy and Fairway. Neither party has put on the record any agreement binding Murphy and RoundPoint directly. This apparent lack of a contract would appear to doom Murphy's contract claim against RoundPoint.

Murphy nevertheless cites a Southern District of Florida case, *Martorella v. Deutsche Bank*, to argue that a servicer can breach a mortgage agreement between borrower and lender when it acts as an independent contractor to the lender. Response to MSJ at 10 (citing 161 F. Supp. 3d 1209, 1225 (S.D. Fla. 2015)). But that misses the point of *Martorella*: there the servicer *was* a party to a servicing agreement with the borrower. *Id.* So the borrower didn't need to infer any extracontractual obligations. By contrast, nothing here indicates Murphy and RoundPoint ever signed a contract binding the two of them.

Even if RoundPoint were a party to the mortgage, moreover, Murphy points to no contractual provision (in that agreement or any other) that it breached. The only potentially relevant provision in the mortgage instrument requires the *borrower*—not the lender or servicer—to maintain insurance on the property. Mortgage § 5.

Nor can the implied covenant of good faith and fair dealing help Murphy. He suggests that RoundPoint breached this implied contractual obligation by "undermin[ing] the borrower's ability to fulfill [his] contractual obligations." Response to MSJ at 10. Kentucky law reads into any contract an obligation to "do everything necessary" to carry it out. *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citation omitted). But an implied covenant of good faith and fair dealing "does not prevent a party from

exercising its contractual rights." *Id.* (citing *Hunt Enterprises, Inc. v. John Deere Indus. Equipment, Co.*, 162 F.3d 1161, 1998 WL 552795 (6th Cir.1998)). Rather, it ensures that neither party "undermine[s] or destroy[s] the other's right to receive the benefits of the agreement." DAVID FRISCH, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, § 1-203:4 (3d. ed.). Here, the mortgage explicitly allowed the lender to obtain force-placed insurance at the borrower's expense. Mortgage § 5. Exercising that right complied with the contract and wasn't a breach of good faith. Regardless, the law implies a duty of good faith only from a binding contract. And here none exists for the law to supplement. So RoundPoint owes Murphy no contractual obligations, express or implied. No record evidence indicates the breach claim should proceed to a jury.

**2. Fiduciary duty.** Murphy argues that RoundPoint also breached a fiduciary duty to him by mismanaging his escrow account and allowing his Hartford policy to lapse. Response to MSJ at 5. RoundPoint, he maintains, owed him a fiduciary duty "to administer the escrow account in the manner consistent with that of a reasonably prudent fiduciary under similar circumstances." Amended Complaint ¶ 25.[7]

But does a fiduciary duty exist at all? The parties haven't identified applicable caselaw considering whether servicers bear a fiduciary duty to borrowers. But Kentucky courts have rejected the notion of a fiduciary duty in lender-borrower relationships—even when the lender also acted as a servicer. In *Wood v. Central Kentucky Federal Savings Bank*, the Court of Appeals addressed a borrower's claims against a bank that both helped place the borrowers' insurance policy and also "paid insurance premiums with escrowed funds." No. 2021-ca-91, 2022 WL 569185, at *4 (Ky. Ct. App. Feb. 25, 2022). Yet the lender/servicer still bore no fiduciary duty to the borrowers. *Id.* The borrowers failed to show that the bank had to put the borrowers' interests above its own—in that case, by purchasing insurance that would cover the borrowers' interests rather than just the bank's. *Id.* Instead, "the clear terms of the contract between the parties established that the [b]ank had permission to act in its own interest by obtaining force-placed insurance." *Id.* Even after 15 years of the bank handling escrowed premiums, the court granted summary judgment, declining to recognize a fiduciary duty owed by the bank. *Id.*[8]

---

[7] To prove a breach of fiduciary duty, a plaintiff must show: 1) a fiduciary duty, 2) its breach, and 3) resulting injury. *Seeger Enterprises*, 518 S.W.3d at 795. In Kentucky, a fiduciary must act in the principal's interest, even to its own detriment. *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 242 (Ky. 2013).

[8] "Generally, '[e]xcept in special circumstances, a bank does not have a fiduciary relationship with its borrowers. The great weight of authority is that while the relationship between a mortgagor and mortgagee is often described as one of trust, technically it is not of a fiduciary character.'" *Eddins v. Cenlar FSB*, 964 F. Supp. 2d 843, 854 (W.D. Ky. 2013)

7

The Court previously denied RoundPoint's motion for judgment on the pleadings on this point. DN 101. Given the briefing and record at that point, the nature of the relationship between it and Murphy remained unclear. That uncertainty stemmed from two issues: whether the mortgage was part of the pleadings and whether that was the "contract" to which Murphy's amended complaint referred regarding RoundPoint's purported loan-servicing duties. (Counsel were unable to answer either question with confidence during the judgment-on-the-pleadings hearing.) Since then, the parties put the mortgage in the record. That contract gives the lender (or the loan servicer on its behalf as part of its servicing obligations) the right to obtain force-placed insurance that protects the lender, but "might or might not protect" the borrower. Mortgage ¶¶ 5, 20.

Murphy's ties to RoundPoint are even weaker than the borrowers' in *Wood*. Unlike RoundPoint, the bank in *Wood* both facilitated the insurance-policy placement and paid its premiums in a lender-borrower relationship that lasted 15 years. And unlike in *Wood*, RoundPoint did not enter any contractual relationship with Murphy. It acts on behalf of the lender, presumably under a contract between the two that hasn't been put in the record.[9] But as in *Wood*, the contract terms here are equally clear: the lender was able to act in its own interests—not Murphy's—by obtaining force-placed insurance. If *Wood*'s borrowers lacked a fiduciary relationship after 15 years of policy placement and premium payments, Murphy—whose relationship with RoundPoint was far more limited and not defined by contract—can't establish one either. With no evidence of a fiduciary duty, Murphy's claim fails.

**3. Negligence**. Did RoundPoint's alleged mismanagement of escrow funds constitute negligence? Response to MSJ at 8–9.[10]

Murphy identifies no Kentucky caselaw imposing such a duty of care on a mortgage servicer. Nor does he address why securing a backup policy—rather than leaving the homeowner uninsured—would violate such a duty. Murphy's argument

---

(quoting *In re Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3d 878, 894 (6th Cir. 2002)) (cleaned up).

[9] Murphy cites precedent from two other jurisdictions recognizing some level of fiduciary obligation between escrow holders and borrowers. But neither decision is binding. And the *Wood* decision (which *is* binding) strongly suggests Kentucky law doesn't or wouldn't impose such an obligation.

[10] To recover on this common-law basis, a plaintiff must prove (1) duty, (2) breach, (3) injury, and (4) causation. *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012). Kentucky law imposes a duty on "every person … to exercise ordinary care … to prevent foreseeable injury." *Grayson Fraternal Ord. of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987). Ordinary care means acting as "a reasonably prudent person would … under the circumstances." *Joiner v. Tran & P Properties, LLC*, 526 S.W.3d 94, 100 (Ky. Ct. App. 2017) (citation omitted).

8

presupposes that RoundPoint's negligence left him uninsured—but the undisputed record shows that never happened. He leans heavily on RoundPoint employee Tyler McGee's deposition to argue that RoundPoint failed to exercise reasonable care regarding the Hartford policy. McGee testified that RoundPoint "could have contacted The Hartford" to confirm and renew the policy. Response to MSJ at 6. Murphy claims this omission created a "known risk of uninsured periods." *Id.* at 9. He accuses RoundPoint of failing to "tak[e] proactive measures …, leaving the property uninsured." *Id.* at 6.

That misrepresents RoundPoint's actions and misstates the result. RoundPoint twice asked Murphy for coverage information—a proactive measure described above. When Murphy didn't respond, RoundPoint again proactively secured new insurance to guarantee coverage. The result: the risk that Murphy's home would be uninsured never materialized. RoundPoint's undisputed efforts prevented that outcome despite Murphy's unresponsiveness.

RoundPoint wasn't required to exhaust every option to find the Hartford policy. "To be reasonable is not to be perfect." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (addressing reasonableness in the Fourth Amendment context). And the record shows RoundPoint acted reasonably to keep the property insured. Thus, Murphy's negligence claim fails not just for lack of damages but for lack of evidence that RoundPoint acted unreasonably or exposed him to harm.

**4. RESPA**. Finally, Murphy claims RoundPoint mismanaged his escrow account in violation of RESPA. The statute requires mortgage servicers to timely pay insurance premiums from escrow. 12 U.S.C. § 2605(g). But its implementing regulation, Regulation X, excuses servicers from paying insurance premiums if they have a "reasonable basis" to believe either (1) the borrower's policy lapsed for reasons other than nonpayment, or (2) the property is vacant. 12 C.F.R. § 1024.17(K)(5)(ii)(A).

The Consumer Financial Protection Bureau interprets Regulation X to cover cases where a "servicer does not receive a payment notice by the expiration date of the borrower's hazard insurance policy." 12 C.F.R. § Pt. 1024, Supp. I. And courts defer to an agency's reasonable interpretation of its own ambiguous rules. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019).

The CFPB anticipated exactly this situation—and the Court would endorse the same interpretation of the regulation even absent any deference. RoundPoint never received a payment notice before the Hartford policy expired. That alone gave RoundPoint a "reasonable basis" to believe the policy had lapsed and excuses it from paying the premium.

RESPA also expressly permits mortgage servicers to obtain force-placed insurance when they have "a reasonable basis to believe the borrower has failed to

9

comply with the loan contract's requirements to maintain property insurance." 12 U.S.C. § 2605(k)(1)(A). To establish a "reasonable basis," a servicer must send two notices 30 days apart. 12 U.S.C. § 2605(l)(1)(B). Those notices must (1) remind the borrower of his insurance obligation, (2) state that the servicer lacks proof of coverage, (3) explain how to provide proof, and (4) warn that the servicer may obtain insurance at the borrower's expense. 12 U.S.C. § 2605(*l*)(1)(A). Then the servicer must wait another 15 days before purchasing force-placed insurance. 12 U.S.C. § 2605(*l*)(1)(C).

At least as far as the summary-judgment record reveals, RoundPoint followed RESPA to the letter. It sent Murphy a notice on May 1, 2019, then another on June 5—more than 30 days later—stating it lacked proof of insurance. McGee Declaration ¶¶ 24–28. It then waited 15 more days before securing force-placed insurance on June 28. *Id.* ¶¶ 29–30. None of this is disputed.

Even if Murphy hadn't abandoned his claims that RoundPoint's actions toward him were part of a "pattern or practice" of noncompliance, this settles it. RESPA doesn't expose RoundPoint to liability; it confirms the company acted lawfully. RoundPoint had a reasonable basis to believe Murphy lacked insurance. That excused it from paying the Hartford premium and allowed it to obtain force-placed insurance. That point resolved, no genuine issue of material fact remains to support Murphy's RESPA claim, and—like the others—no reasonable jury could find in his favor.

\* \* \*

The Court grants RoundPoint's motion for summary judgment on all four counts (DN 117) and will enter final judgment in its favor in a subsequent order, *see* FED. R. CIV. P. 58.

Benjamin Beaton, District Judge
United States District Court

March 24, 2025